**Fredrick Jordan BATTS, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 14–07–00865–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 17, 2009.

Terrence W. Mcdonald, San Antonio, TX, for appellants.

Lisa G. Porter, Houston, TX, for State.

Panel consists of Chief Justice HEDGES and Justices SEYMORE and SULLIVAN.

## OPINION

ADELE HEDGES, Chief Justice.

Appellant, Fredrick Jordan Batts, was charged with the first degree felony of engaging in organized criminal activity with an underlying offense of making a false statement to obtain credit.[1] Appellant, along with seven other co-defendants, was accused of participating in a mortgage fraud scheme that illegally appropriated approximately $2,234,485.00 from WMC Mortgage Company ("WMC"), a lending institution. After a jury trial, appellant was found guilty, and he was sentenced to 25 years in prison. On appeal, he raises four issues, contending that: (1) the evidence is legally and factually insufficient to support the underlying felony of making a false statement to obtain credit; (2) the trial court erred in failing to instruct the jury that four State witnesses were accomplices as a matter of law; and (3) the State failed to sufficiently corroborate a co-defendant's accomplice testimony. We affirm.

## I. BACKGROUND

Appellant's conviction stems from a mortgage fraud scheme allegedly engaged in by appellant and his seven co-defendants: James Evans (a real estate attorney), Meheret Woldie (a loan processor), Keith Wiltz (a real estate appraiser), Mohammad Asaduddin (a mortgage broker), Doris Wang and Viet Ba Nguyen (real estate agents), and Cistie Dixon. The indictment alleged that appellant and his co-defendants participated in a scheme to swindle WMC out of millions of dollars by obtaining fraudulently inflated home mortgage loans. According to the State's witnesses, the conspiracy unfolded in the following manner: appellant owned two real estate investment companies, Dual Access and Assets Management of Texas Holding Company ("AMTHC"). Through Dual Access and AMTHC, appellant masterminded a complex mortgage scam to defraud WMC by: (1) contracting to buy property at market value from a homeowner, (2) entering into a second contract to sell the homeowner's property to a straw buyer at a price substantially above market value before actually purchasing the property from the homeowner, (3) to pay the original homeowner, taking out a mortgage loan in the name of the straw buyer using falsified loan applications and counterfeit documents, (4) using the proceeds wrongfully received from WMC to purchase the property from the original homeowner, and (5) splitting the remaining proceeds with other participants in the fraudulent scheme.

As a result of appellant's fraudulent acts, WMC disbursed more funds that it otherwise would have loaned, allowing appellant to profit from the difference between the inflated loan amount and the market value of the property. Furthermore, the straw buyer was typically left holding the property in his name and owing WMC the loan proceeds appropriated by appellant and his co-defendants. Appellant and his co-defendants appropriated over $2.2 million on 20 real estate properties. At trial, the State focused on five properties: 707 Timber Cove Drive, 525 Arlington Street, 8614 Misty Sage Court, 8610 Amy Brook Court, and 20406 Long Cypress Drive.

---

1. A person commits the offense of engaging in organized criminal activity if, intending to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires to commit the felony offense of making a materially false or misleading written statement to obtain credit, including a mortgage loan. *See* Tex. Penal Code §§ 71.02(a)(8), 32.32(b).

### 707 Timber Cove Drive

Brian Dewhurst testified that he owned a home at 707 Timber Cove Drive and put the property on the market in 2005. He listed Timber Cove at its fair market value: $266,000.00. AMTHC subsequently agreed to purchase Timber Cove, and on April 6, 2005, Dewhurst signed a contract to sell Timber Cove to AMTHC for $262,000.00 cash. The Timber Cove closing was set for the end of April, and appellant signed an earnest-money check on the sales contract. Days after the Dewhurst–AMTHC contract, AMTHC entered into a second contract to sell Timber Cove to Larry Ransome. Ransome testified that appellant talked to him about appellant's investment businesses, and appellant promised Ransome financial prosperity by drawing equity out of various residential properties. Appellant explained that he would purchase a property below market value and then draw out the equity by reselling the property at market value to Ransome. Ransome believed that appellant was offering a sound investment deal and agreed to purchase Timber Cove from AMTHC for $460,000.00.[2] At the time AMTHC entered into the contract for sale with Ransome, the company did not own Timber Cove.

Woldie testified that she and appellant then applied for a mortgage loan in Ransome's name. Woldie testified that Ransome submitted a loan application with accurate information, but she and appellant subsequently manipulated the information by inflating his income and the value of his assets. Woldie further testified that she and appellant generated counterfeit documents to support the falsified loan application. Specifically, a counterfeit escrow receipt was created to reflect that earnest money was paid in escrow, a counterfeit title policy was created to reflect that AMTHC had authority from Dewhurst to sell Timber Cove to Ransome, and a counterfeit assignment of rights and notification was created to support the counterfeit title policy. Woldie testified that she altered the loan application with false information and created the counterfeit title policy and assignment of rights at appellant's instruction. She also testified that appellant forged the signatures of Ransome and Dewhurst on the assignment of rights. A falsified appraisal substantially exaggerating the value of Timber Cove was also generated to support the loan application.[3] Ransome also testified that an affidavit of occupancy and financial status was fake and falsely reflected that Timber Cove would be used as his primary residence. Shortly thereafter, the falsified loan application and supporting counterfeit documents were submitted to WMC for approval.

On April 27, 2005, AMTHC closed on Timber Cove with Dewhurst; however, AMTHC did not simultaneously disburse the balance owed to Dewhurst. Accordingly, an amendment to extend the closing date to May 5, 2005 was executed by AMTHC. Appellant signed an earnest money check for the extension. On May 5, 2005, WMC funded Ransome's loan appli-

---

2. Dewhurst testified that he did not know that appellant had entered into a contract for sale with Ransome on Timber Cove.

3. Wiltz performed an appraisal valuing Timber Cove at approximately $462,000.00. Wiltz's appraisal was purportedly performed on March 1, 2005, before AMTHC contracted with Dewhurst and Ransome. Furthermore, the State's witness Deloris Lynn Kraft–Longoria, an investigator with the Texas Appraiser Licensing and Certification Board and a real estate appraiser, testified that the comparables included in Wiltz's appraisal to support the market value of $462,000.00 were not suitable comparables and Timber Cove was not accurately appraised at $462,000.00.

cation and transferred $456,838.71 to First Colony. First Colony then transferred $446,836.28 to AMTHC. The following day, AMTHC made a wire transfer in the amount of $253,903.74 to Allegiance Title Company, the settlement agent in the Dewhurst–AMTHC sale. Appellant subsequently signed a check on AMTHC's bank account payable to Ransome in the amount of $49,914.28 with the notation "loan proceeds." Thereafter, appellant signed and remitted checks to Ransome for the monthly mortgage payments on Timber Cove. However, appellant eventually stopped paying, and Ransome was unable to continue the mortgage payments. Consequently, the bank foreclosed on Timber Cove in 2006.

### 525 Arlington Street

Pineda Investments owned a house at 525 Arlington Street. Adriana Pineda, executive vice president of Pineda Investments, testified that on behalf of Pineda Investments, she put the Arlington house on the market for sale in 2005 at its fair market value: $250,000.00. On May 11, 2005, AMTHC agreed to purchase Arlington and entered into a contract for sale to purchase Arlington from Pineda Investments. The agreed-upon price was $235,000.00 cash. Appellant signed a check drawn on the AMTHC bank account in the amount of $1,000.00 for earnest money on the contract.

Shortly thereafter, AMTHC entered into a second contract to sell Arlington to Philip Askew. Askew testified that appellant asked him, as a favor, to purchase Arlington in Askew's name. Appellant explained that he had intended to use Arlington for his jewelry business with a "silent partner." However, the purchase and business plan had fallen through when the silent business partner did not purchase the property. Appellant told Askew that he had secured a discounted price on Arlington and did not want to pass on such a good buy. Appellant promised that he would pay the taxes, mortgage, and maintenance on the property. Appellant further promised Askew that he would purchase Arlington back from Askew within six months. In exchange for using Askew's name and credit, appellant offered Askew the equity in the house, which, according to appellant, was $40,000.00. Askew agreed and entered into a contract to purchase Arlington from AMTHC for $575,000.00. AMTHC did not own the property at the time it entered into the contract with Askew. The contract was later amended, reducing the sales price to $500,000.00.[4]

Woldie testified that she and appellant then applied for a mortgage loan in Askew's name. Woldie testified that Askew submitted a loan application with accurate information, but she subsequently manipulated the information by inflating his income and the value of his assets. Woldie further testified that she generated counterfeit documents to support the falsified loan application, including forged leases reflecting that Askew was receiving monthly rents from property he owned and an assignment of rights and notification falsely reflecting that AMTHC had authority to sell Arlington on behalf of Pineda Investments.[5] Woldie observed appellant forge Adriana Pineda's signature on the assignment of rights. Adriana Pineda also testified that her signature

4. Neither of the contracts between AMTHC and Askew required earnest money.

5. Askew did not execute the leases and testified that he did not own one of the properties subject of a lease at the time the lease was purportedly executed. Another counterfeit lease purported to lease residential property to appellant's employee, Lawrence Williams.

was forged on the assignment of rights and notification. Woldie further testified that she altered the loan application with false information and created the counterfeit documents at appellant's instruction. A falsified appraisal substantially exaggerating the value of Arlington was also generated to support the loan application.[6] Shortly thereafter, the falsified loan application and supporting counterfeit documents were submitted to WMC for approval.

WMC ultimately funded Askew's loan application and transferred $498,893.11 to First Colony, the settlement agent. First Colony then wired $485,355.46 to AMTHC. AMTHC closed on Arlington with Pineda Investments.[7] Askew later received a bank wire from AMTHC in the amount of $40,000.00. Thereafter, appellant made no mortgage payments and never purchased the property back from Askew.

### 8614 Misty Sage Court

Asher and Sandra Griffin owned a house at 8614 Misty Sage Court. The couple put the property on the market for sale in 2005, and on May 10, 2005, they entered into a contract to sell Misty Sage to AMTHC for $400,000.00 cash.[8] Appellant signed an earnest-money check drawn on the AMTHC bank account in the amount of $3,000.00. Days after the Griffin–AMTHC contract, AMTHC entered into a

second contract to sell Misty Sage to Tommie Nicholson. Nicholson testified that he believed he was entering into a valid investment agreement with appellant by purchasing Misty Sage. Similar to Ransome, appellant promised Nicholson financial prosperity by drawing equity out of residential properties. Appellant explained that he would purchase Misty Sage below market value and then draw out the equity by reselling the property at market value to Nicholson. Based upon appellant's representations, Nicholson believed appellant's offer was a sound investment and agreed to purchase Misty Sage from AMTHC for $575,000.00.[9]

Woldie testified that she and appellant then applied for a mortgage loan in Nicholson's name. Woldie testified that Nicholson submitted a loan application with accurate information, but she subsequently manipulated the information by inflating his income and the value of his assets. Woldie further testified that she and appellant generated counterfeit documents to support the falsified loan application. Specifically, a counterfeit escrow receipt was created to reflect that earnest money had been deposited into escrow. Also generated were a counterfeit lease reflecting that Nicholson was receiving monthly rents from property he owned,[10] a falsely obtained special warranty deed reflecting that AMTHC had authority from the Grif-

---

6. Wiltz performed an appraisal valuing Arlington at approximately $580,000.00. Kraft–Longoria, an expert real estate appraiser, testified that the comparables included in Wiltz's appraisal to support the market value of $580,000.00 were not suitable comparables and Arlington was not accurately appraised at $580,000.00.

7. Appellant was present at closing.

8. Cistie Dixon signed the contract for sale on behalf of AMTHC.

9. At the time AMTHC entered into the contract for sale with Nicholson, the company did not own Misty Sage. Dixon also signed this contract on behalf of AMTHC. The Griffins testified that they did not know that AMTHC had entered into a contract with Nicholson to sell Misty Sage. Furthermore, Nicholson testified that he had no knowledge about the previous contract for sale between AMTHC and the Griffins.

10. Nicholson testified that he did not execute the counterfeit lease and that his signature was forged.

fins to sell Misty Sage, and a counterfeit assignment of rights and notification purporting to give AMTHC authority to sell Misty Sage. Woldie testified that she altered the loan application with false information and created counterfeit documents at appellant's instruction. She also testified that appellant forged the signatures on the assignment of rights. A falsified appraisal substantially exaggerating the value of Misty Sage was also generated to support the loan application, valuing the property at $584,000.00.[11] Nicholson also testified that his signature was forged on the assignment of rights and on one of the loan applications. Shortly thereafter, the falsified loan application and supporting counterfeit documents were submitted to WMC for approval.

WMC funded Nicholson's loan application and transferred $571,977.25 to First Colony, the settlement agent. First Colony then wired $559,515.47 to AMTHC. AMTHC closed on Misty Sage with the Griffins, paying the balance of $383,537.04. Nicholson later received a bank wire from AMTHC in the amount of $91,489.00. Upon the Nicholson–AMTHC closing, Nicholson moved into Misty Sage. However, he subsequently was unable to continue making the mortgage payments, and the bank foreclosed on the property.

### 8610 Amy Brook Court

Nicholson also entered into a contract with AMTHC to purchase a home located at 8610 Amy Brook Court. Amy Brook

was built in or around 2004 and was placed on the market at $400,000.00. The following year, James and Suzanne Armstrong acquired Amy Brook at a steep discount, purchasing it for $300,000.00. However, the Armstrongs put the home back on the market for $360,000.00 two weeks after they purchased it.

On June 22, 2005, Nicholson entered into a contract with AMTHC to purchase Amy Brook for $515,000.00.[12] Nicholson then signed a second contract on Amy Brook agreeing to purchase the property at a higher price—$550,000.00. The contract represented that AMTHC was selling Amy Brook as assignee of the Armstrongs. However, AMTHC never had the authority to sell Amy Brook on behalf of the Armstrongs. On June 28, 2005, AMTHC entered into a contract with the Armstrongs to purchase Amy Brook for $360,000.00 cash. Appellant signed an earnest-money check in the amount of $3,000.00 drawn on the AMTHC bank account. The following day, Wiltz fraudulently appraised the property at $553,000.00.[13] Nicholson testified that he believed he was entering into a valid investment agreement with appellant by purchasing Amy Brook.

Woldie testified that she and appellant applied for a mortgage loan in Nicholson's name. Woldie testified that Nicholson submitted a loan application with accurate information, but she subsequently manipulated the information by inflating his income and the value of his assets. Woldie further testified that she and appellant

---

11. Wiltz performed the exaggerated appraisal on Misty Sage. Kraft–Longoria testified that the comparables included in Wiltz's appraisal to support the market value of $584,000.00 were not suitable comparables and that Misty Sage was not accurately appraised at $584,000.00.

12. Dixon signed the contract for sale on behalf of AMTHC.

13. Wiltz performed the exaggerated appraisal on Amy Brook as well. Kraft–Longoria testified that the comparables included in Wiltz's appraisal to support the market value of $553,000.00 were not suitable comparables and Amy Brook was not accurately appraised at $553,000.00.

generated counterfeit documents to support the falsified loan application. A counterfeit assignment of rights reflecting that AMTHC had authority from the Armstrongs to sell Amy Brook was generated and submitted to WMC. Additionally, a counterfeit special warranty deed with a vendor's lien was submitted to WMC also purporting to give AMTHC authority to sell Amy Brook on behalf of the Armstrongs. Woldie testified that she altered the loan application with false information and created the counterfeit assignment of rights at appellant's instruction. She also testified that appellant forged the signatures on the assignment of rights. Nicholson testified that his signature was forged on the assignment of rights and on one of the loan applications. Wiltz's falsified appraisal substantially exaggerating the value of Amy Brook was also submitted to support the loan application. Shortly thereafter, the falsified loan application and supporting counterfeit documents were submitted to WMC for approval.

WMC ultimately funded Nicholson's loan application and transferred $571,977.25 to First Colony. First Colony then wired $559,515.47 to AMTHC. AMTHC closed on Amy Brook with the Armstrongs, paying the balance of $345,715.72. Nicholson later received a bank wire from AMTHC for approximately $83,000.00, but gave $40,000.00 back to appellant. Thereafter, Nicholson was unable to continue making the mortgage payments, and the bank foreclosed on Amy Brook.

### 20406 Long Cypress Drive

Deutsche Bank National Trust owned 20406 Long Cypress Drive in 2005. Derrick Williams testified that that he entered into a contract with AMTHC to purchase Long Cypress as an investment. Williams testified that he was approached by Tina Pick, whom he had met through a friend. Pick asked Williams to purchase Long Cypress in his name and to resell it back to her the following year. Pick told Williams that she was unable to purchase the home with her credit and wanted to use Williams's name and credit to acquire Long Cypress. Pick promised that she would rent the property for a year and pay the mortgage payments. Pick also offered Williams $20,000.00 for use of his credit and assured Williams that she would purchase the property from him within a year.

Williams agreed and entered into a contract for sale with AMTHC to purchase Long Cypress for $260,000.00.[14] Williams's loan information was gathered and submitted to WMC. Woldie testified that she generated a fake lease reflecting that Williams was receiving monthly rental income on residential property he owned. Williams testified that unbeknownst to him, his income and the value of his assets had been substantially inflated on his loan application. Williams also testified that a counterfeit occupancy and financial status affidavit submitted to WMC falsely represented that he intended to use Long Cypress as his primary residence, when in fact it was purchased for investment purposes. A counterfeit assignment of rights and notification was submitted to WMC, falsely reflecting that AMTHC was assignee for Deutsche Bank to sell Long Cypress to Williams. Williams testified that his signature was forged on the assignment of rights. Based upon this and other false information, WMC approved the loan, and Williams closed on Long Cypress.

Appellant signed a check on the AMTHC bank account payable to Pick in the amount of $30,214.10. In turn, Pick paid Williams $17,500.00 for use of his

14. Dixon signed on behalf of AMTHC.

credit. Pick moved into Long Cypress, but she made only one payment and eventually left the property. Williams subsequently learned that title to the Long Cypress was never transferred in his name but remained in the seller's name. Apparently, First Colony failed to file Williams's deed with the county. At the time of trial, Long Cypress was in foreclosure.

As the properties were foreclosed, appellant's scheme began to collapse. Harris County District Attorney's Office opened an investigation into the activities of appellant and his two real estate companies. The district attorney's office learned that the scheme included a number of people, some of whom were prosecuted and some of whom were not. Appellant and his seven co-defendants were ultimately charged by felony indictments for their participation in creating and using false information to obtain mortgage loans from WMC, defrauding WMC out of over $2.2 million. Appellant was ultimately found guilty and sentenced to 25 years in prison.

Taken out of order, appellant raises the following issues: (1) the trial court erred in failing to instruct the jury that the straw buyers were not only accomplices as a matter of fact, but also as a matter of law; (2) the State failed to adequately corroborate the accomplice testimony of Woldie; and (3) the evidence is legally and factually insufficient to support the underlying felony of making a false statement to obtain credit.

## II. JURY INSTRUCTION

■ In his third issue, appellant challenges the jury instruction regarding accomplice testimony.[15] At trial, the court

below instructed the jury that the four straw buyers, Larry Ransome, Philip Askew, Tommie Nicholson, and Derrick Williams, were accomplices as a matter of fact. Appellant now contends that the trial court erred in failing to instruct the jury that the four straw buyers were not only accomplices as a matter of fact but also accomplices as a matter of law. Appellant contends that he was also entitled to an accomplice-as-a-matter-of-law jury instruction because the straw buyers (1) were involved in all the fraudulent transactions, (2) engaged in the same alleged conduct as appellant, (3) received monetary compensation for their participation in the scheme, and (4) were an integral part of the combination. Because appellant made no request in the trial court that the jury be instructed the straw buyers were accomplices a matter of law, any charge error is reversible only if egregious harm is shown. *Druery v. State*, 225 S.W.3d 491, 504 (Tex. Crim.App.2007); *Taylor v. State*, 7 S.W.3d 732, 737 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd). Errors resulting in egregious harm are those that affect the "very basis of the case, those depriving the defendant of a valuable right, or those that vitally affect a defensive theory." *Druery*, 225 S.W.3d at 504 (quotations and citations omitted).

■ An accomplice is an individual who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex.Crim.App.2006); *Yost v. State*, 222 S.W.3d 865, 871 (Tex.App.-Houston [14th Dist.] 2007, pet. denied). The participation must involve an affirma-

---

15. Normally, we consider first the legal and factual sufficiency of the evidence. Because appellant also challenges whether the jury should have been instructed that particular testimony was accomplice evidence and challenges the State's corroboration of accomplice testimony, and because these issues affect our sufficiency review, we consider first the jury-instruction and accomplice-testimony complaints.

tive act that promoted the commission of the offense with which the accused was charged. *Paredes v. State,* 129 S.W.3d 530, 536 (Tex.Crim.App.2004). A witness is not an accomplice merely because he knew of the offense and did not disclose it, or even if he concealed it. *Druery,* 225 S.W.3d at 498; *Cocke,* 201 S.W.3d at 748. A witness may be an accomplice either as a matter of law or as a matter of fact. *Cocke,* 201 S.W.3d at 747. An accomplice as a matter of law is one who is susceptible to prosecution for the offense with which the accused is charged or a lesser included offense. *Paredes,* 129 S.W.3d at 536; *Jarnigan v. State,* 57 S.W.3d 76, 89 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd). If the evidence clearly shows that the witness was an accomplice as a matter of law, the trial court must so instruct the jury. *Paredes,* 129 S.W.3d at 536; *Gonzalez v. State,* 63 S.W.3d 865, 881 (Tex.App.-Houston [14th Dist.] 2001), *aff'd,* 117 S.W.3d 831 (Tex.Crim.App.2003). However, if the evidence on the issue is conflicting or is unclear as to whether the witness is an accomplice, the trial court must leave to the jury the question of whether the inculpatory witness is an accomplice as a matter of fact. *Paredes,* 129 S.W.3d at 536; *Gonzalez,* 63 S.W.3d at 881. Because the evidence determines what accomplice instruction, if any, needs to be given as to a particular witness, we discuss the status of each straw buyer separately.

### A. Larry Ransome

■ Ransome was the straw buyer in the Timber Cove transaction. At trial, documentary evidence was introduced to show Ransome's involvement in the scheme, which included a loan application, purportedly signed by Ransome, falsely inflating his income; a fraudulent appraisal; a fraudulent special warranty deed; falsified closing documents; and a check reflecting loan proceeds paid to Ransome.

Although the documentary evidence appears, on its face, to implicate Ransome as an active participant, Ransome testified that he did not assist in falsifying the loan and closing documents. Specifically, Ransome testified that (1) he did not make the false statements regarding his income and assets in the loan and closing documents, (2) unbeknownst to him, someone had made those false representations, (3) his signature was forged on the loan application and a number of other closing documents, and (4) based upon appellant's representations, Ransome believed the transaction was proper and legal. Ransome testified that appellant convinced him that appellant simply "had drawn the equity out of the home" by first purchasing it below market value and then reselling it to Ransome at market value. The difference between the two sales, according to appellant, was the equity which would be split between the two. Ransome also testified that appellant promised to pay the monthly mortgage payments until the property was subsequently sold to a third party. Based upon these representations, Ransome believed the transaction was legal.

On the issue of his status as an accomplice, Ransome's testimony contradicted the documentary evidence. Ransome's trial testimony raised a fact issue as to whether he actively participated in the combination and whether he had the requisite culpable mental state. Because the evidence on the issue of Ransome's status as an accomplice was conflicting, the question of whether he was an accomplice was for the jury to decide. *See Paredes,* 129 S.W.3d at 536; *Gonzalez,* 63 S.W.3d at 881. Accordingly, the trial court did not err in failing to give an accomplice as-a-matter-of-law instruction as to Larry Ransome.

### B. Philip Askew

■ Philip Askew was the straw buyer in the Arlington transaction. The docu-

mentary evidence admitted at trial to establish Askew's involvement included a real estate contract between AMTHC and Askew, falsified residential leases reflecting that Askew was leasing residential property and receiving monthly rental income, a falsified special warranty deed and assignment of rights and notification, and a bank wire from AMTHC to Askew reflecting loan proceeds from the Arlington transaction. Many of these documents purport to bear Askew's signature. At trial, however, Askew denied any knowledge about or active participation in the fraudulent scheme. Askew testified that based upon appellant's representations, Askew believed the real estate transaction to be legal. He believed that he was merely doing a "favor" for appellant because appellant's business partner was unable to put the property in his name. Askew testified that he submitted *accurate* personal income information to appellant; the false written statements in the loan and closing documents were later added without his knowledge or consent. Askew further testified that his signature was forged on a number of the loan documents, including a real estate contract between AMTHC and Askew, Askew's loan application, the assignment of rights and notification, and a loan affidavit. Additionally, Askew testified that the falsified residential leases were created and submitted to WMC without his knowledge or consent.

On the issue of his status as an accomplice, Askew's testimony contradicted the documentary evidence. His trial testimony raised a fact issue as to whether he actively participated in the combination and whether he had the requisite culpable mental state. Therefore, the question of whether he was an accomplice was for the jury to decide. *See Paredes,* 129 S.W.3d at 536; *Gonzalez,* 63 S.W.3d at 881. Accordingly, the trial court did not err in

failing to give an accomplice-as-a-matter-of-law instruction as to Phillip Askew.

### C. *Tommie Nicholson*

 Tommie Nicholson was the straw buyer in the Misty Sage and Amy Brook transactions. The documentary evidence introduced at trial to show Nicholson's involvement included a real estate contract between AMTHC and Nicholson, loan applications falsely representing Nicholson's monthly income and his ownership interest in residential property, a HUD–1 settlement statement falsely representing the value of Nicholson's assets, a falsified residential lease reflecting that Nicholson was leasing property and receiving monthly rental income, a falsified notification and assignment of rights, and a bank wire transferring loan proceeds to Nicholson from AMTHC. Most of these documents were purportedly signed by Nicholson. Nicholson testified that his signature was forged on most of the documents and that he did not assist in making the false statements and creating the falsified documents. Nicholson testified that (1) he did not make the false statements in the loan application and closing documents, (2) he was unaware that someone had made those false representations, (3) his signature was forged on his typed loan application and a number of other closing documents, and (4) based upon appellant's representations, Nicholson believed the real estate transactions were appropriate and legal.

 Nicholson's testimony negated the state of mind necessary to be guilty of participating in the combination. When there is a question whether a witness is an accomplice, it is proper to submit that issue to the jury. *See Jarnigan,* 57 S.W.3d at 91. Because the evidence does not clearly show that Nicholson was an accomplice, the trial court did not err in

failing to give an accomplice as-a-matter-of-law instruction as to Tommie Nicholson.

### D. Derrick Williams

 Derrick Williams was the straw buyer in the Long Cypress transaction. The documentary evidence introduced at trial to prove Williams's involvement included a real estate contract between Williams and AMTHC, the loan application falsely representing Williams's income, an occupancy and financial status affidavit falsely representing that Long Cypress would be his primary residence, and a falsified assignment of rights. These falsified documents were purportedly signed by Williams. Williams, however, testified that he did not assist in falsifying the documents and that his signature was forged on most of the documents. In fact, Williams learned after the fact that title to Long Cypress was never transferred to his name but remained in the seller's name. Apparently, First Colony failed to file Williams's deed with the county. Williams testified that he was not aware of the fraudulent acts of appellant and his co-defendants and believed that he had legally and properly purchased the Long Cypress property.

Williams's testimony indisputably challenged the state of mind necessary to be guilty of participating in the combination. Because the evidence does not clearly show that Williams was an accomplice, the trial court did not err in failing to give an accomplice-as-a-matter-of-law instruction as to Derrick Williams. *See Paredes*, 129 S.W.3d at 536; *Gonzalez*, 63 S.W.3d at 881.

Despite appellant's contentions, the evidence did not conclusively establish that the straw buyers had the intent to commit the underlying felony with which appellant was charged or that the straw buyers conspired with appellant to commit the offense with which he was charged. The straw buyers' testimonies negated the state of mind necessary to be guilty of participating in the combination and raised a fact issue as to whether they were accomplice witnesses. Accordingly, it was appropriate for the trial court to instruct the jury on an accomplice as a matter of fact rather than as a matter of law. We overrule appellant's third issue.

### III. CORROBORATION OF WOLDIE'S ACCOMPLICE TESTIMONY

 In his fourth issue, appellant contends that under the accomplice-witness rule, Woldie's accomplice testimony was not sufficiently corroborated to support appellant's conviction. It is well established that a conviction based upon the testimony of an accomplice must be sufficiently corroborated by other non-accomplice evidence. Tex.Code Crim. Proc. art. 38.14. As a co-indictee, Woldie is an accomplice as a matter of law. *See Burns v. State*, 703 S.W.2d 649, 651 (Tex.Crim.App. 1985); *Nolley v. State*, 5 S.W.3d 850, 853 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Therefore, Woldie's testimony must be corroborated by other non-accomplice evidence connecting appellant to the crime. Tex.Code Crim. Proc. art. 38.14; *Malone v. State*, 253 S.W.3d 253, 257 (Tex.Crim. App.2008).

 In our review, we eliminate all accomplice testimony from consideration and examine the remaining portions of the record for any non-accomplice evidence tending to connect appellant with the commission of the crime. *Malone*, 253 S.W.3d at 257. The corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself. *Id.* The evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended

to connect the accused to the offense. *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex.Crim.App.1997). Because no precise rule can be formulated regarding the amount of evidence required to sufficiently corroborate the testimony of an accomplice witness, each case must be decided upon its own facts and circumstances. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex.Crim. App.1996).

 In determining whether evidence tends to connect a defendant to the offense, we must view the corroborating evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex.Crim.App.2008); *Gill v. State*, 873 S.W.2d 45, 48 (Tex.Crim.App. 1994). If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, the requirement of article 38.14 has been fulfilled. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex.Crim. App.1999); *Delacruz v. State*, 278 S.W.3d 483, 487 (Tex.App.-Houston [14th Dist.] 2009, pet. ref'd). Thus, for the conviction to rest upon Woldie's testimony, there must simply be *some* non-accomplice evidence which tends to connect appellant to the commission of the offense alleged in the indictment. *See Brown*, 270 S.W.3d at 567 (quoting *McDuff v. State*, 939 S.W.2d 607, 613 (Tex.Crim.App.1997)).

Woldie testified that appellant hired her as a loan processor at AMTHC during the relevant time period and briefed her on the company's real estate business operations. Woldie testified that appellant owned AMTHC, and through his business, appellant organized and operated a fraudulent real estate scheme. Woldie testified that appellant created and submitted false loan and closing documents to obtain fully funded mortgage loans from WMC. She further testified that the false written statements in the loan and closing documents were either made by appellant or

made at his instruction. Woldie also testified that appellant compensated other participants in the scheme for their role in the combination.

Appellant argues that Woldie's accomplice testimony was the only evidence linking him to the crime and was not corroborated by other non-accomplice evidence. Appellant contends that the remaining non-accomplice evidence reflects only the existence of a mortgage fraud scheme, but falls short of connecting him to the combination. We disagree. Contrary to appellant's contention, the State offered substantial non-accomplice evidence that sufficiently corroborates Woldie's testimony. Specifically, the State introduced documentary and testimonial evidence that Dual Access and AMTHC were appellant's companies and that he committed the fraudulent scheme through the two companies. Ransome, Askew, and Nicholson testified that appellant represented himself as the owner and president of the investment company. A business card was also introduced reflecting that appellant was the president of the company. The State further introduced the loan and closing documents implicating AMTHC as an active participant in making false written statements to WMC to obtain mortgage loans. These documents falsely reflected that AMTHC had the authority from the original sellers to convey the properties to the straw buyers. Moreover, Ransome, Askew, and Nicholson testified that appellant recruited them to "invest" in the underlying real estate and promised financial rewards. The State also introduced checks signed by appellant, drawn on the AMTHC bank account, payable to his co-defendants, to the straw buyers, and to others for their roles in the combination. Some of these checks were issued for earnest-money de-

posits and for subsequent mortgage payments on the properties.

The documentary evidence, coupled with the testimony of Ransome, Askew, and Nicholson, demonstrated that appellant: (1) owned AMTHC, the company through which the fraudulent scheme was carried out, (2) personally recruited many of the straw buyers who participated in the real estate transactions, (3) authorized funds to be paid to the straw buyers and his codefendants, and (4) signed mortgage-payment checks and earnest-money checks relating to the real estate in the underlying fraudulent transactions. Viewing the corroborating evidence in the light most favorable to the verdict, it was reasonable for jurors to conclude that the non-accomplice evidence tended to connect appellant to the commission of the offense. Accordingly, we overrule appellant's fourth issue.

## IV. SUFFICIENCY OF THE EVIDENCE

■■■■■ In appellant's first and second issues, he challenges the legal and factually sufficiency of the evidence supporting the underlying felony of making a false statement to obtain credit. In a legal sufficiency review, we view all the evidence in the light most favorable to the verdict and determine whether a rational jury could have found the defendant guilty of all the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Williams v. State,* 270 S.W.3d 140, 142 (Tex.Crim.App.2008). The jury is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Lancon v. State,* 253 S.W.3d 699, 707 (Tex.Crim.App. 2008). Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Cleburn v. State,* 138 S.W.3d 542, 544 (Tex.App.-Houston [14th Dist.]

2004, pet. ref'd). We must resolve any inconsistencies in the testimony in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex.Crim.App.2000).

In a factual sufficiency review, we review all the evidence in a neutral light, favoring neither party. *Watson v. State,* 204 S.W.3d 404, 414 (Tex.Crim.App.2006). We then ask (1) whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the jury's verdict seems clearly wrong and manifestly unjust, or (2) whether, considering the conflicting evidence, the jury's verdict is against the great weight and preponderance of the evidence. *Id.* at 414–17; *Marshall v. State,* 210 S.W.3d 618, 625 (Tex.Crim.App.2006). We cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Watson,* 204 S.W.3d at 417. If an appellate court determines that the evidence is factually insufficient, it must explain in exactly what way it perceives the conflicting evidence greatly to preponderate against conviction. *Id.* at 414–17; *Rivera–Reyes v. State,* 252 S.W.3d 781, 784 (Tex.App.-Houston [14th Dist.] 2008, no pet.). The reviewing court's evaluation should not intrude upon the fact-finder's role as the sole judge of the weight and credibility given to any witness's testimony. *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000).

■■■■ A defendant commits the offense of engaging in organized criminal activity if, intending to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires to commit the felony offense of making a materially false or misleading written statement to obtain credit, including a mortgage loan. *See* Tex. Penal Code §§ 71.02(a)(8), 32.32(b). On appeal, appellant challenges the sufficiency of the evidence on the underlying offense of making

a false or misleading written statement to obtain the mortgage loans involved in the case. Appellant essentially argues that the evidence proved the existence of mortgage fraud, but fell short of proving that appellant, himself, knowingly and intentionally made false or misleading statements to WMC to obtain the mortgage loans. He cites to the following evidence: (1) two homeowners, Dewhurst and Armstrong, had no dealings with appellant; (2) the evidence did not establish that appellant owned or managed AMTHC; (3) the evidence did not establish that any of the fraudulent proceeds were transferred to appellant's personal bank account; (4) there is no evidence that AMTHC's bank account was in fact appellant's bank account; (5) the incriminating documents, i.e., the falsified appraisals and falsified loan application and other documents, were not in appellant's possession; and (6) Asaduddin and Woldie, two other co-defendants, worked independently from appellant and were responsible for the loan-application process. According to appellant, this evidence does not sufficiently prove that he knowingly and intentionally altered the appraisals, loan applications, and other documents used to obtain inflated mortgage loans from WMC.

Contrary to appellant's contention, the evidence was legally and factually sufficient to sustain his conviction. At trial, the State produced sufficient evidence that appellant and his co-defendants applied for inflated mortgages on behalf of buyers and submitted loan applications and other documentation containing false and misleading information about the buyers' current residence, employment, income, assets, and existing debt. There was evidence of WMC's reliance on these false statements in approving loans that it would otherwise have denied. Woldie, a key witness against appellant and participant in the scheme, provided testimony directly linking appellant to the combination and averred that appellant was the mastermind behind the scheme. Woldie testified that appellant instructed her to increase the incomes of the straw buyers on their loan applications and to create counterfeit documents to support the increased incomes so that the loans would be approved. Doris Wang corroborated Woldie's testimony, indicating that AMTHC had a computer program to create counterfeit documents and that she heard appellant ask Woldie to create bank statements fraudulently increasing a straw buyer's income. Each of the straw buyers testified at trial that the loan documents contained false income information and that they did not submit the false statements. Woldie testified that she and appellant forged the signatures of the straw buyers on the loan applications.

Additionally, Woldie testified that appellant forged the signatures of the original homeowners on the assignment of rights and notification forms so that AMTHC could sign documents for the original sellers as their assignee and to ensure that AMTHC would receive the loan proceeds from WMC. She testified that she took the contracts bearing the original sellers' signatures to appellant, and he used the documents as an example to forge the original sellers' signatures on the assignment forms. Woldie further testified that she personally observed appellant forge the signatures of Brian Dewhurst, Adriana Pineda, James and Suzanne Armstrong, and Asher and Sandra Griffin. These original sellers confirmed that their signatures had been forged.

The State also produced evidence that appellant and his co-defendants sought mortgages on properties at values greatly in excess of the properties' actual sale prices or fair market values. To support applications for loans in excess of the properties' market values, appellant and his co-

defendants procured artificially inflated appraisals. Using these false and misleading appraisals, appellant obtained loans in excess of the actual sale value of the property. The record reflects that appellant compensated Wiltz for grossly overstating the value of the properties in the appraisals. Doris Wang testified that appellant used only Wiltz to do appraisals. Wiltz would comply with appellant's request for appraisal in a certain amount. Appellant signed approximately 21 checks payable to Wiltz for his appraisals. These appraisals were submitted to WMC to support the falsified loan applications.

The State further produced evidence that appellant masterminded the mortgage fraud scheme which formed the basis of the indictment and ultimately appellant's conviction. Woldie testified that appellant caused her and other co-defendants to conduct certain fraudulent acts to promote the overall mortgage fraud scheme. Woldie's testimony was corroborated with other documentary and testimonial evidence. The straw buyers, most of whom were falsely promised that the properties were investments and that appellant would find tenants, and use the rent to pay the mortgages, testified that appellant managed the scheme. Appellant enticed the buyers with "no money down" promises and compensation for their participation. Appellant signed checks drawn on the AMTHC bank account to complete the fraudulent real estate transactions. Appellant wrote the earnest-money checks for the properties, the checks for the loan proceeds to the straw buyers, and the checks for the mortgage payments. Further, AMTHC, appellant's company, was an active participant in the fraudulent scheme. Appellant represented to the straw buyers that AMTHC was his business. Appellant handled and controlled AMTHC's finances and the flow of funds in the AMTHC bank account. Appellant also signed checks for

his personal use from the AMTHC account. Furthermore, the WMC loan proceeds were consistently wired to AMTHC before being disbursed to co-defendants and other participants.

Based on the foregoing testimonial and documentary evidence, we find that the evidence was legally and factually sufficient to sustain the verdict. We overrule appellant's first two issues. Having overruled all of appellant's appellate points, we affirm the trial court's judgment.