Affirmed and Memorandum Opinion
filed August 31, 2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00068-CR

NO.
14-09-00069-CR



Leslie Megan
Lewis-Grant, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 52nd District Court

Coryell County, Texas

Trial Court
Cause Nos. FO-07-19102 & FCM-07-19103



 

MEMORANDUM OPINION 

            Leslie Megan
Lewis-Grant was convicted of the felony offense of murder and sentenced to
confinement for life in the Institutional Division of the Texas Department of
Criminal Justice.  During the same trial, Lewis-Grant was also convicted of the
felony offense of tampering with or fabricating physical evidence and sentenced
to ten years’ confinement in the Institutional Division of the Texas Department
of Criminal Justice.  She appeals the murder conviction on these grounds: (1)
the evidence supporting the murder conviction is legally and factually
insufficient; (2) the evidence was insufficient to connect her to the offense
and corroborate the accomplice-witness testimony; (3) the trial court erred in
submitting a law-of-parties instruction to the jury; and (4) the trial court
erred in failing to submit an accomplice-witness instruction to the jury. 
Lewis-Grant also appeals her conviction of the offense of tampering with or
fabricating physical evidence because: (1) the evidence was insufficient to
connect her to the offense and corroborate the accomplice-witness testimony;
and (2) the trial court erred in failing to submit an accomplice-witness
instruction to the jury.  We affirm. 

I

At about five o’clock in the morning on September 15,
2007, Coryell County deputy sheriff David White responded to a call about a stationary
pick-up truck in the middle of Greenbriar Road.  Once he arrived at the scene,
Deputy White testified he discovered an empty vehicle with its engine running as
well as a body dumped in the ditch beside the road.  Coryell County lieutenant
Ricky Helms also responded to the call.  He observed the body was wrapped in
some bedding, and the body appeared to have multiple stab wounds to the chest. 
Lieutenant Helms testified he recognized the deceased as James Michael Grant (the
“complainant”).   

Coryell County investigators and Texas Ranger Jesse
Ramos went to the complainant’s residence.  Ranger Ramos stated the
complainant’s bedroom was ransacked, and there was a “bloody mess” on the
mattress, walls, floors, and underneath the clothing in the room. 
Additionally, there was testimony that some property was missing from the
home.  In Ranger Ramos’s opinion, the complainant was stabbed to death while in
bed and transferred to his pick-up truck, and then the assailant ransacked the
room to make it seem as if the home had been burglarized.            

At trial, the State’s theory of the case was that the
complainant’s ex-wife, appellant Leslie Megan Lewis-Grant, had solicited her
boyfriend to kill the complainant.  Lewis-Grant and the complainant were
married in 1990 and had two children, Jamie and Kate Grant.  But in 2004 the
couple divorced.  During trial, many of the State’s witnesses testified the
divorce was “messy,” and Lewis-Grant hated the complainant because he had
obtained custody of the children.  Multiple witnesses, including Lewis-Grant’s
supervisor Diane Tadlock, Lewis-Grant’s father Teddy Lewis, Lewis-Grant’s
coworker Julie White, and local-business owner Deborah Buster, stated they
heard Lewis-Grant say she wished the complainant would die or she would be
better off if the complainant were dead.  Tadlock emphasized Lewis-Grant said
every other day, if not daily, she wished the complainant would die.  Tadlock
testified, “[Lewis-Grant] said it in a joking manner, but we knew she was
really wishing it.”   

Garnett Grant, the complainant’s father, testified
that the complainant began taping his conversations with Lewis-Grant because she
previously told the complainant she had tried to kill him by switching the insulin
he took for his diabetes.  The complainant’s girlfriend Cherryl Tull, Coryell County
detective Armando Paniagua, Garnett Grant, White, and Tadlock also testified
they heard Lewis-Grant had purposefully switched the complainant’s insulin in
order to harm him.  White and Tadlock both stated as a licensed vocational
nurse Lewis-Grant had access to insulin, and White testified Lewis-Grant knew
how to administer insulin and could readily distinguish between different types
of insulin.  Tull recalled a conversation with the complainant in which he told
her Lewis-Grant had told him she took insulin from her work and filled his
syringes with different insulin.  White explained if someone were to switch a
person’s insulin from a slow-acting insulin to a fast-acting insulin, which is what
Lewis-Grant was trying to do, a person’s blood sugar would drop, and that
person would go into a diabetic coma.  Additionally, Tadlock and White stated Lewis-Grant
discussed baking the complainant a cake “with a lot of extra sugar,” so “his
sugar would go really high.”  

Both White and Tadlock also testified Lewis-Grant
told them about a dream she had in which her son killed the complainant by
stabbing him with a knife or machete.  After discussing her dream, Lewis-Grant
then “kind of jokingly” stated, “I think I am going to buy [Jamie] a knife” and
“I’m going to buy [Jamie] a machete for Christmas.”  Ed Palmer, the
complainant’s best friend, testified about an altercation between Lewis-Grant and
the complainant.  During the argument, Lewis-Grant went to her vehicle, retrieved
a loaded gun, and said she was going to “kill that son-of-a-bitch.”  Palmer
stopped Lewis-Grant and removed the gun and bullets from her possession.  

            When Lewis-Grant was
separated from the complainant, Leewood Broussard moved in with her.  At the
time, Broussard’s daughter was dating a man named Jeremy Knutson.  At trial, Knutson
testified he had contact with Lewis-Grant five or six times.  Knutson stated
she offered him $5,000 to kill the complainant, and she made the offer more
than once.  

            In July 2007,
Lewis-Grant met John Hopkins, who was a twenty-year-old ex-convict who
frequently hung out with Jamie.  Shortly after meeting, Hopkins and Lewis-Grant
began an intimate relationship.  Hopkins testified Lewis-Grant would talk to
him about wanting someone to kill the complainant.  He stated Lewis-Grant told
him he could have anything he wanted if he killed the complainant, and he could
also take anything from the complainant’s house after killing him.  Hopkins
stated Lewis-Grant also promised him the income from the complainant’s social-security
benefits once the complainant was dead.  Additionally, Hopkins expressed he
thought Lewis-Grant was being sincere when she discussed killing the
complainant.  Multiple times Hopkins testified there was an understanding between
Lewis-Grant and himself that he would kill the complainant.  

            The day before the
complainant died, Tadlock testified Lewis-Grant was very upset at work.  The
complainant was apparently trying to prevent Lewis-Grant’s mother from visiting
their daughter, Kate, at school.  Tadlock stated Lewis-Grant left work early to
remedy the situation.  Hopkins also testified Lewis-Grant was arguing with the
complainant the day before he was killed.  Hopkins stated he was already
drinking that day, and he decided to kill the complainant because “[the
complainant] made [Lewis-Grant] cry” and he “basically had enough of it.”  

Hopkins continued to drink and self-medicate
throughout the day.  He stated he called Jamie and asked to let him know when
the complainant went to sleep.  Hopkins testified Lewis-Grant did not know he
planned on killing the complainant that day, but there was an understanding
between the two of them that he would kill the complainant at some point. 
Additionally, Hopkins stated Jamie knew why Hopkins wanted to come into the
house.  Several State witnesses testified Jamie was loyal to his mother, and
Lewis-Grant talked about her hatred for the complainant when both children were
present.  

            After calling
Jamie, Hopkins went to a Wal-Mart and stole a knife and a machete.  He also
bought and consumed more alcohol while he waited for Jamie to call.  The State’s
trial exhibits included telephone records that indicated Jamie called Hopkins
six times between 12:39 a.m. and 2:25 a.m.  Hopkins testified Jamie let him
into the complainant’s house through the backdoor.  He stated he told Jamie to
keep Kate in her bedroom and to go to his room.  Hopkins then went into the
complainant’s bedroom, put his hand on the complainant, and stabbed the
complainant numerous times.  He testified Jamie watched him kill the
complainant, and then Jamie went over to the complainant’s body and stomped on
it.  Medical examiner Dr. Janice Townsend-Parchman testified all the stab
wounds contributed to the complainant’s death, but just the stab wounds to the
complainant’s neck, lungs, and around his heart individually could have caused
him to die quickly.

            Hopkins and Jamie
then ransacked the room to make it appear like a burglary.  Hopkins stated he took
a 9-mm handgun, two extra clips for the gun, and $380 from the complainant’s
wallet.  He testified he and Jamie wrapped the complainant’s body in the sheets
and bedding from the bed, threw the complainant into the bed of his truck, and
then Jamie drove the complainant’s car to Greenbriar Road while he followed in
Lewis-Grant’s car.  Hopkins stated they dumped the body in the ditch, and then
proceeded to Lewis-Grant’s home.

            Hopkins and Jamie
went to Lewis-Grant’s house.  Hopkins testified he was “covered in blood” and
“Jamie was tracking in blood from the bottom of his boots from when he stomped
on his own father’s body.”  According to Hopkins, Lewis-Grant was in shock and
began screaming.  Hopkins stated Lewis-Grant was probably in shock because she
did not know he was going to kill the complainant that particular night.  But
he again emphasized there was an understanding between Lewis-Grant and himself
that he would kill the complainant at some point.  Hopkins removed his clothes
and instructed Lewis-Grant to take his and Jamie’s clothes and burn them in the
barbeque pit.  Hopkins testified he did not see Lewis-Grant actually put the
clothes in the pit, but witnessed Lewis-Grant “messing” with the pit.  Later
that morning, Hopkins saw police officers driving by on Greenbriar Road.  He
testified he told Jamie and Lewis-Grant to put the fire out, and then he asked
Lewis-Grant to take the burned clothes and put them in a trash bag.  Hopkins
then took the trash bag and Jamie’s boots and disposed of the items.  If
questioned about the incident, Hopkins stated he told Lewis-Grant to say she
and Hopkins were at Lewis-Grant’s home all night.    

When Coryell County investigators and Ranger Ramos
went to the complainant’s residence the morning he died, they found Jamie and
Kate alone in the home.  Although Jamie told investigators he and his sister
had been asleep, telephone records indicated there were at least five phone
calls between Jamie and Lewis-Grant before 10:00 a.m.—the time Lewis-Grant told
Lieutenant Helms she learned about the murder.  Later, Lewis-Grant testified at
trial she discovered the complainant died when Jamie called her “around 8:30
a.m. the next morning,” and she “threw some clothes on” and went over to the
complainant’s home.  Detective Paniagua stated Lewis-Grant was shaky when she
arrived at the complainant’s home.  She informed the officers she lived on
Greenbriar Road, which was near the location of the complainant’s body.  This
prompted Lieutenant Helms to photograph Lewis-Grant’s car and hands.  Detective
Paniagua testified he believed Lewis-Grant was a suspect in the complainant’s
murder. 

During the investigation, Deputy White informed
Ranger Ramos he had seen smoke coming from a chiminea at a home near the site
where the complainant’s body was dumped.  Ranger Ramos later discovered the
residence belonged to Lewis-Grant, and officers received her permission to
search her home.  Ranger Ramos testified the chiminea did not appear to have
been lit that day, but the barbeque pit contained “several charred remains of
black, fine charcoal particles, some of it even appeared to be denim material
to blue jeans and the brads on jeans . . . [and] the backside of a button fly
to jeans.”  The materials in the barbeque pit were “doused in water as if
something had been extinguished recently.”  At trial, Lewis-Grant denied
assisting Jamie and Hopkins in burning their clothes.  Tadlock testified
Lewis-Grant said she was burning sick-call requests the morning the
complainant’s body was found, and that was the reason there was smoke coming
from her chiminea.  White stated Lewis-Grant’s statement was odd because
Lewis-Grant had recently been reprimanded for destroying sick-call requests.  

Lieutenant Helms testified Lewis-Grant did not seem
upset when he interviewed her after the murder.  Ranger Ramos also stated
Lewis-Grant did not cry or appear upset after the complainant had been killed,
but instead she was “acting normal.”  Teddy Grant and Glennette Lewis,
Lewis-Grant’s stepmother, testified Lewis-Grant was not crying or sad, and she
proclaimed to them, “I have custody [of the children] now.”  Hopkins stated
Lewis-Grant constantly thanked him for killing the complainant, and she told
him “it was one of the best things anybody could have done for her.”

            Hopkins did not
confess to the complainant’s murder until late October.  The sheriff’s
department received a call on October 28 from Jamie that Hopkins was
threatening to commit suicide.  At trial, the State admitted the 9-1-1 call in
which Jamie stated Hopkins had a gun and had written a suicide note.  Officers
responded to Lewis-Grant’s home, but they located Hopkins at a nearby residence
holding the resident at gunpoint.  Officers arrested Hopkins, and while
confessing to the complainant’s murder, he implicated both Jamie and
Lewis-Grant.  Lieutenant Helms stated Hopkins said Lewis-Grant had asked him on
several occasions to kill the complainant, and she offered him the income from
the complainant’s social-security benefits in return.  At trial, Hopkins
testified he pleaded guilty to capital murder for killing the complainant, and
he was sentenced to confinement for life without the possibility of parole.  Ranger
Ramos testified Jamie’s confession corroborated the majority of Hopkins’
statements and confession, including that Lewis-Grant assisted in burning
Jamie’s and Hopkins’ clothes after the murder.  Officers then arrested and
indicted both Jamie and Lewis-Grant for the murder of the complainant.  At
trial, the State presented evidence that Jamie had also pleaded guilty to the
complainant’s murder.

            Lewis-Grant
testified the complainant was abusive toward her, and she was afraid of him. 
She also stated she never asked anyone, including Knutson or Hopkins, to kill
the complainant.  Lewis-Grant also denied helping Hopkins and Jamie burn their
clothes.  After hearing all the evidence, the jury convicted Lewis-Grant of the
lesser-included offense of murder and the felony offense of tampering with or
fabricating evidence.  Lewis-Grant was sentenced to confinement for life for
the murder of the complainant, and she was sentenced to ten years’ confinement
for tampering with or fabricating physical evidence.  This appeal followed.     

II

For
her convictions of murder and tampering with or fabricating physical evidence,
Lewis-Grant complains about the lack of an accomplice-witness instruction and insufficient
evidence to corroborate accomplice-witness testimony.  Because these complaints
are interrelated, we will address them together.[1] 





 

A

First,
Lewis-Grant contends the trial court erred in failing to submit an
accomplice-witness instruction for Jamie Grant.  She claims Jamie acted as
Hopkins’ accomplice in killing the complainant and by destroying evidence of
the crime.  Because the State introduced several of Jamie’s statements during
the trial, Lewis-Grant argues the court should have included an
accomplice-witness instruction for Jamie in the jury charge.  She argues the
jury used Jamie’s statements to corroborate Hopkins’ testimony, and the lack of
an instruction forbidding the use of such corroboration egregiously harmed her. 
The State contends an accomplice-witness instruction is only required when the
accomplice actually testifies under oath or affirmation in the presence of a
tribunal.  Because Jamie never testified at trial, the State argues he was not
an accomplice witness and his out-of-court statements did not necessitate an
accomplice-witness instruction.  The trial court, therefore, did not err in failing
to include the instruction in the jury charge.  

In
Texas, a conviction cannot be based on the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the
offense committed.  Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon
2006); Cocke v. State, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006).  An
accomplice is one who participated with another before, during, or after the
commission of a crime.  Herron v. State, 86 S.W.3d 621, 631 (Tex. Crim.
App. 2002); Nguyen v. State, 177 S.W.3d 659, 668 (Tex. App.—Houston [1st
Dist.] 2005, pet. ref’d); Maynard v. State, 166 S.W.3d 403, 410 (Tex.
App.—Austin 2005, pet. ref’d).  Participation requires an affirmative act that
promotes the commission of the offense with which the defendant is charged.  Cocke,
201 S.W.3d at 748.  In other words, “a person is an accomplice if there is
sufficient evidence connecting [him] to the criminal offense as a blameworthy
participant.”  Blake v. State, 971 S.W.2d 451, 454–55 (Tex. Crim. App.
1998).  A prosecution witness who is indicted for a lesser-included offense
based on his alleged participation in the commission of the defendant’s charged
crime is also an accomplice as a matter of law.  Herron, 86 S.W.3d at
631; Nguyen, 177 S.W.3d at 668.  If the prosecution witness is an
accomplice as a matter of law, the court must instruct the jury accordingly.  Herron,
86 S.W.3d at 631.   

Accomplice-witness
testimony should be considered with caution because accomplices often have
incentive to lie to procure reduced sentences or clemency.  See Blake,
971 S.W.2d at 454.   Accomplices have a reason to fabricate stories;
accomplices may want to shift blame and consequences to another person or may have
been promised, or hope to receive, clemency or a reduced sentence in exchange
for testifying.  Bingham v. State, 913 S.W.2d 208, 211 (Tex. Crim. App.
1995).  To protect the defendant from the accomplice’s incentive to lie, the
accomplice-witness rule mandates that juries must be told if a witness is also
an accomplice and that juries may only consider accomplice-witness testimony if
it is corroborated by non-accomplice evidence.  Blake, 971 S.W.2d at
454–55.    

But
article 38.14 does not apply to an accomplice’s out-of-court statements. Bingham,
913 S.W.2d at 210; White v. State, 982 S.W.2d 642, 649 (Tex.
App.—Texarkana 1998, pet. ref’d); see also Hammond v. State, 942
S.W.2d 703, 707 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (because
accomplice did not testify at trial, his statements needed no corroboration
even though other witnesses testified about his out-of-court statements); Maynard,
166 S.W.3d 403, 413 (stating because the accomplice’s out-of-court statements
were not testimony, they did not invoke the accomplice-witness rule).  The
Texas Court of Criminal Appeals narrowly defined the word “testimony” in
article 38.14 as evidence given by a witness under oath or affirmation in the
presence of a live tribunal.  Bingham, 913 S.W.2d at 210, 213.  Thus, an
out-of-court statement would not fall under the definition of “testimony,” and article
38.14 would not apply.  See id. at 210; Nguyen, 177 S.W.3d at 669. 


Jamie’s
statements about the complainant’s death and the destruction of evidence were
introduced through Ranger Ramos’s testimony.  Because the accomplice-witness
rule—article 38.14—applies only to testimony adduced in open court by live
witnesses, there is no basis for an accomplice-witness instruction for Jamie.  See
Nguyen, 177 S.W.3d at 669 (citing Bingham, 913 S.W.2d at 210). 
We hold the trial court did not err in failing to include an accomplice-witness
instruction about Jamie in the jury charge.  Accordingly, we overrule Lewis-Grant’s
complaints.             

B

Lewis-Grant
contends the evidence to convict her of murder and tampering with or fabricating
evidence is insufficient and does not corroborate Hopkins’ testimony. 
Specifically, she claims the evidence only demonstrated she disliked her
husband and wished he was dead.  The State argues the non-accomplice-witness
testimony needs only to “tend to connect” Lewis-Grant with the commission of
the offenses.  Because there is ample evidence to “tend to connect” Lewis-Grant
with the commission of both crimes, the State contends Hopkins’ testimony was
sufficiently corroborated.  

            As
previously stated, a conviction based on the testimony of an accomplice must be
sufficiently corroborated by other non-accomplice evidence.  Tex. Code Crim.
Proc. Ann. art 38.14; Simmons v. State, 282 S.W.3d 504, 505 (Tex. Crim.
App. 2009); Batts v. State, 302 S.W.3d 419, 432 (Tex. App.—Houston [14th
Dist.] 2009, no pet.).  The accomplice-witness rule is of statutory origin and
differs from legal- and factual-sufficiency standards because it is not derived
from federal or state constitutional principles.  Druery v. State, 225
S.W.3d 491, 498 (Tex. Crim. App. 2007).  In our review, we eliminate all
accomplice-witness testimony from consideration and then determine whether the
remaining non-accomplice-witness testimony and evidence tends to connect the
accused with the commission of the crime.  Malone v. State, 253 S.W.3d
253, 257 (Tex. Crim. App. 2008); Yost v. State, 222 S.W.3d 865, 872
(Tex. App.—Houston [14th Dist.] 2007, pet. ref’d).  The Texas Court of Criminal
Appeals has recently concluded when there are two views of the evidence—one
tending to connect the accused to the offense and the other not—then appellate
courts should defer to the fact-finder’s view of the evidence.  Simmons,
282 S.W.3d at 508.      

The
corroborating evidence does not need to be sufficient in itself to establish
guilt, nor must it directly connect the accused to the commission of the
offense.  Batts, 302 S.W.3d at 432; Yost, 222 S.W.3d at 872; see
also Simmons, 282 S.W.3d at 508 (quoting Andrews v. State, 370 So.2d
320, 322 n.5 (Ala. Crim. App. 1979) (“‘Corroborate means to strengthen, to make
stronger; to strengthen, not the proof of any particular fact to which the
witness has testified, but to strengthen the probative, [in]criminating force
of his testimony.’”) (citations omitted)).  The evidence must merely link the
accused in some way to the commission of the crime, and show rational jurors
could conclude the evidence sufficiently tended to connect the accused with the
offense.  Batts, 302 S.W.3d at 432–33.  Each case must be decided on its
own facts and circumstances.  Id. at 433 (citing Dowthitt v. State,
931 S.W.2d 244, 249 (Tex. Crim. App. 1996)).  

Reviewed
individually, suspicious circumstances like an accused’s motive, presence at
the scene, or opportunity to commit the crime are not by themselves sufficient
to corroborate an accomplice-witness’s testimony.  Yost, 222 S.W.3d at
872 (citing Gill v. State, 873 S.W.2d 45, 49 (Tex. Crim. App. 1994)). 
But suspicious circumstances that are individually insufficient may be combined
with other circumstances to constitute sufficient corroborative evidence to
sustain a conviction.  Id.; see, e.g., Mitchell v. State, 650
S.W.2d 801, 808 (Tex. Crim. App. 1983) (stating the accused’s presence with the
accomplice, in conjunction with other circumstances, may be sufficient to
corroborate accomplice-witness testimony); Paulus v. State, 633 S.W.2d
827, 846 (Tex. Crim. App. [Panel Op.] 1981) (concluding evidence demonstrating
the accused’s motive or opportunity can be considered in connection with
evidence that tends to connect the accused with the crime).  Additionally, ill
will toward the deceased may be a factor that corroborates the
accomplice-witness testimony.  See, e.g., Rodriquez v. State, 508
S.W.2d 80, 83 (Tex. Crim. App. 1974).  Corroborating evidence may also be
comprised of circumstantial evidence.  Gosch v. State, 829 S.W.2d 775,
777 (Tex. Crim. App. 1991).  Even apparently insignificant incriminating
circumstances may be satisfactory corroborating evidence.  Trevino v. State,
991 S.W.2d 849, 852 (Tex. Crim. App. 1999).   

1

            We
first review the accomplice-witness testimony and non-corroborating evidence with
regard to Lewis-Grant’s tampering with or fabricating physical evidence
conviction.  Hopkins testified at trial Lewis-Grant asked him to kill the
complainant in exchange for income from the complainant’s social-security
benefits and any items he wanted from the complainant’s home.  Although he
testified Lewis-Grant did not know he was going to kill the complainant that
particular night, he stated numerous times there was an understanding between
himself and Lewis-Grant that he would kill the complainant at some point. 
After Hopkins killed the complainant, he testified he and Jamie went to
Lewis-Grant’s house.  Hopkins testified he was “covered in blood from the
amount of stab wounds,” and “Jamie was tracking in blood from the bottom of his
boots from when he stomped on his own father’s body.”  According to Hopkins, he
removed his clothes and instructed Lewis-Grant to take his and Jamie’s clothes
and burn them in the barbeque pit.  Hopkins testified he did not see
Lewis-Grant actually put the clothes in the pit, but Jamie told him she burned
the clothes.  Additionally, Hopkins stated he witnessed Lewis-Grant “messing”
with the barbeque pit.  He then testified he told Jamie and Lewis-Grant to put
the fire out, and then he asked Lewis-Grant to take the burned clothes and put
them in a trash bag.  

In
reviewing the non-accomplice witness testimony, multiple State witnesses,
including Tadlock, White, Buster, Garnett Grant, and Teddy Lewis testified
Lewis-Grant wanted the complainant to die.  There was testimony she was upset
the complainant received custody of their children.  Lewis-Grant even testified
she hated the complainant.  Tadlock, Lewis, Tull, Detective Panigua, and
Garnett Grant all stated they heard Lewis-Grant had previously tried to
seriously harm the complainant by switching his insulin.  Palmer testified
Lewis-Grant got into an altercation with the complainant during which she
retrieved a loaded gun said she was going to kill the complainant.  Furthermore,
Knutson testified Lewis-Grant offered him, on more than one occasion, $5,000 to
kill the complainant.  It is apparent from the testimony at trial that
Lewis-Grant had a motive to assist in killing the complainant, and she harbored
ill will toward him.  See Rodriquez, 508 S.W.2d at 83 (stating a
defendant’s ill will toward the deceased may be a factor that corroborates
accomplice-witness testimony); Yost, 222 S.W.3d at 872 (discussing that
a defendant’s motive can be combined with other evidence to “tend to connect” a
defendant to the crime).

Lewis-Grant
also made several contradictory statements both in and out of court.  Lieutenant
Helms testified Lewis-Grant originally told him she and Hopkins were at her
home asleep the night the complainant was killed.  At trial, Lewis-Grant
testified she went to bed around 10:30 p.m., but woke up around 2:30 a.m. and noticed
Hopkins was gone.  Belinda Bankhead-Toker, Lewis-Grant’s friend, testified
Lewis-Grant told her the night the complainant was killed, she “had gotten
really drunk” and passed out by 9:00 p.m.  Tadlock testified Lewis-Grant told
her Jamie had called her house in the middle of the night and asked to speak to
Hopkins.  There was also testimony from State witnesses that Lewis-Grant said
the complainant’s death was probably a result of drugs, and the police had
discovered drugs in the complainant’s storage shed.  Lewis-Grant changed her
story about what she was doing the night of the complainant’s death, and she
fabricated a theory of how he died.  Suspicious circumstances that are
individually insufficient may be combined with other circumstances to
constitute sufficient corroborative evidence to sustain a conviction.  See
Yost, 222 S.W.3d at 872.  

Furthermore,
even apparently insignificant incriminating circumstances may be satisfactory
corroborating evidence.  See Trevino, 991 S.W.2d at 852.  Deputy
White testified he saw smoke coming from a chiminea at a home near the location
where he found the complainant’s body.  He also stated there were many lights
on around the home.  In the barbeque pit at Lewis-Grant’s home, Ranger Ramos
discovered remains of a pair of blue jeans.  The materials in the barbeque pit
were “doused in water as if something had been extinguished recently.”  Coryell
County evidence technician John Blanchard also testified there were two bottles
of lighter fluid next to the barbeque pit.  Ranger Ramos stated Jamie’s confession
corroborated Hopkins’ statements and confession, including that Lewis-Grant
assisted in burning the clothes they were wearing that night.  Although
Lewis-Grant denied assisting Hopkins and Jamie in burning their clothes, she
did tell Tadlock the reason smoke was coming from her house was because she was
awake that morning burning sick-call requests.  Lewis-Grant was at her home
that morning, and she had the opportunity to participate in destroying evidence
of the complainant’s murder.  See Paulus, 633 S.W.2d at 846.  

Corroborating
evidence does not need to be sufficient in itself to establish guilt, nor must
it directly connect the accused to the commission of the offense.  Batts,
302 S.W.3d at 432; Yost, 222 S.W.3d at 872.  Thus, we conclude the evidence
links Lewis-Grant in some way to the tampering with evidence and shows rational
jurors could conclude the evidence sufficiently tended to connect the accused
with the offense.  See Batts, 302 S.W.3d at 432–33.  

2

            Next,
we review the accomplice-witness testimony and non-corroborating evidence with
regard to Lewis-Grant’s murder conviction.  In addition to Hopkins’ testimony
set out in the section above, he also testified he first thought about killing
the complainant “about a month” after Lewis-Grant said she wanted him to kill
the complainant.  He stated Lewis-Grant wanted exclusive custody of her
children, and she probably would get it only if the complainant was dead.  Hopkins
also described in detail how he killed the complainant.  When asked if he took
items from the complainant’s home because Lewis-Grant told him he was entitled
to those items, Hopkins answered, “Yes.”  Hopkins also stated he drove
Lewis-Grant’s car and used her credit card because he felt it was part of the
payment for killing the complainant.  He again emphasized there was an
understanding between himself and Lewis-Grant, based on their prior
conversations, that he would kill the complainant.

Hopkins
testified that after he killed the complainant, his relationship with
Lewis-Grant was very good and she thanked him almost daily for doing it, but Hopkins
also stated Lewis-Grant constantly worried they would get caught.  Hopkins
testified Lewis-Grant tried to divert attention from herself and Hopkins by
telling people someone was after her, and that the same person had attempted to
set fire to her home.  In fact, Hopkins explained he set fire to Lewis-Grant’s
home “at her direction.”  

In
reviewing the non-accomplice-witness evidence, we incorporate the same
circumstances, testimony, and evidence described in the section above and
detailed in the facts.  As previously stated, Lewis-Grant harbored ill will
toward the complainant.  See Rodriquez, 508 S.W.2d at 83.  Lewis-Grant
had a motive and opportunity to commit the offense.  See Paulus,
633 S.W.2d at 846 (discussing opportunity); Yost, 222 S.W.3d at 872
(discussing motive).  

Moreover,
she spoke with Jamie the night before the complainant was killed, and at least
five times before 10:00 a.m. the morning of his death.  Garnett Grant and Kathy
Grant, the complainant’s sister, stated Jamie hated the complainant, and Kathy
Grant testified she thought Jamie was trained to hate the complainant.  Bankhead-Toker
stated after the complainant was killed, Lewis-Grant came over to her house and
told her that Jamie killed the complainant.  Ranger Ramos testified that
Jamie’s confession corroborated “the majority of” Hopkins’ statements and
confessions—thus, implicating Lewis-Grant in the complainant’s murder.

Furthermore,
Lieutenant Helms and Ranger Ramos both testified Lewis-Grant did not seem upset
that the complainant was dead.  Tadlock stated when she visited Lewis-Grant,
Lewis-Grant was “tearful, then normal, then tearful” again, but her demeanor
did not seem real.  Glennette Lewis testified that after the complainant died,
Lewis-Grant announced, “I have custody [of the children] now.”  Additionally,
Tadlock and White stated Lewis-Grant began receiving the income from the
complainant’s social-security benefits, and Tadlock testified Lewis-Grant
bragged about having extra money.

Suspicious
circumstances like Lewis-Grant’s motive and opportunity to commit the crime combined
with other circumstances constitute sufficient corroborative evidence to
sustain the murder conviction.  See Yost, 222 S.W.3d at 872. 
Thus, we conclude the evidence links Lewis-Grant in some way to the offense and
shows rational jurors could conclude the evidence sufficiently tended to
connect the accused with the offense.  See Batts, 302 S.W.3d at
432–33.  Accordingly, we overrule Lewis-Grant’s corroboration and
accomplice-witness issues. 

III

In her fourth issue concerning her murder conviction,
Lewis-Grant complains the trial court erred by including a law-of-parties
instruction in the jury charge.  She contends by submitting the law-of-parties
instruction to the jury, the trial court expanded the theory of liability the
State alleged in the indictment and caused her egregious harm.  The State
argues the indictment alleged capital murder, and the charge allowed for a
conviction for the lesser-included offense of murder based on the facts of the
case.  Because the charge included an instruction on the law of parties, the
State contends the “the jury could have found [Lewis-Grant] solicited,
encouraged, directed, aided, or attempted to aid Hopkins by employing him to
cause [the complainant’s] death pursuant to their agreement and understanding
he would do so.”  Furthermore, Lewis-Grant never objected to the jury charge;
thus, the State argues Lewis-Grant must show the instruction egregiously harmed
her.  

A person commits the offense of capital murder if he
commits the murder for remuneration or the promise of remuneration or employs
another to commit the murder for remuneration or the promise of remuneration. 
Tex. Penal Code Ann. § 19.03(a)(3) (Vernon 2003 & Supp. 2009).  A person
commits murder if he intentionally or knowingly causes the death of another
person or intends to cause serious bodily injury and commits an act clearly
dangerous to human life that causes the death of another.  Tex. Penal Code Ann.
§ 19.02(b)(1), (2) (Vernon 2003).  A person acts intentionally with respect to
the nature of his conduct or to a result of his conduct when it is his
conscious objective or desire to engage in the conduct or cause the result.  Id.
§ 6.03(a) (Vernon 2003).  A person acts knowingly with respect to the nature of
his conduct or to circumstances surrounding his conduct when he is aware of the
nature of his conduct or that the circumstances exist.  Id. § 6.03(b). 
A person also acts knowingly if he is aware his conduct is reasonably certain
to cause the result.  Id.  

Further, a person is “criminally responsible as a
party to an offense” if the offense was committed “by his own conduct, by the
conduct of another for which he is criminally responsible, or by both.”  Id.
§ 7.01(a) (Vernon 2003).  A person is criminally responsible for an offense
committed by the conduct of another if, acting with intent to promote or assist
the commission of the offense, he solicits, encourages, directs, aids, or
attempts to aid the other person to commit the offense.  Id. §
7.02(a)(2) (Vernon 2003).  

Lewis-Grant acknowledges murder is a lesser-included
offense of capital murder.[2] 
She also does not complain the State was required to allege law of parties in
the indictment.[3] 
Thus, her complaint appears to be that while the indictment only alleged she
employed Hopkins to murder the complainant, the law-of-parties instruction
included all the language in section 7.02(a)(2) of the Texas Penal Code—“solicits,
encourages, directs, aids, or attempts to aid the other person to commit the
offense”—and thus expanded the State’s theory of liability.  Lewis-Grant focuses
on the phrase “by employing” in the indictment.  Of the action verbs in the
law-of-parties instruction, she contends “employ” is synonymous only with
“solicit” or “direct.”  Because the instruction also included “encourages” and
“aids, or attempts to aid,” Lewis-Grant complains the State was allowed to
prove “something less” than what was actually alleged in the indictment.  

Lewis-Grant relies on Judge Clinton’s concurring
opinion in Walker v. State, 823 S.W.2d 247, 249–54 (Tex. Crim. App. 1991)
(per curiam) (Clinton, J., concurring), for the proposition that a court should
not summarily reproduce “abstract portions” of the definitions in section 7.02
of the Texas Penal Code.  Additionally, Lewis-Grant argues Johnson v. State,
739 S.W.2d 299 (Tex. Crim. App. 1987), holds the law-of-parties instruction
should be limited to the facts of a case.  But as the State notes, Walker
involved a jury charge in which there was no law-of-parties instruction
provided to the jury.  See Walker, 823 S.W.2d at 248.  Johnson
is also not instructive because the phrase “solicits, encourages, directs, aids,
or attempts to aid” was not in the jury charge even though the State’s theory
of the case was that the appellant was guilty as a party to the offense.  See
739 S.W.2d at 300.  The Johnson court held it was error for the trial
court to refuse the appellant’s request for a more explicit application of the
law of parties to the case.  Id. at 305.  In neither case does the court
of criminal appeals conclude that section 7.02 of the Texas Penal Code can be
broken or parceled into various pieces to include in the jury charge, and we
decline to extend the law to do so.  If anything, Johnson implied all the
language in section 7.02 should be included in the jury charge if the State is
seeking a conviction based on law of parties.  See id.  Lewis-Grant has,
therefore, not cited a case on point that supports her argument.  See
Tex. R. App. P. 38.1(i).  Furthermore, as the court of criminal appeals stated
in Chatman v. State, if a defendant wants a “more explicit application
of a particular method of acting as a party, it is his burden to request such
or object to the charge.”  846 S.W.2d 329, 332 (Tex. Crim. App. 1993).  Lewis-Grant
did neither.  Accordingly, we overrule Lewis-Grant’s fourth issue.    

IV

Lewis-Grant complains the evidence is legally and
factually insufficient to support her murder conviction.  Specifically, she
contends there is no evidence she planned to kill the complainant or “that she
actually assisted in any way in committing the murder.”  Lewis-Grant also
argues there is no evidence that there was an understanding between herself and
Hopkins.  The State contends the evidence is legally sufficient to prove
Lewis-Grant committed murder under the theory of law of parties because she actively
engaged in encouraging, aiding, or directing Hopkins to kill the complainant. 
The State asserts Lewis-Grant’s intent can be inferred from circumstantial
evidence such as acts, words, and conduct.  Additionally, inconsistent
statements, concealing incriminating statements, and implausible explanations
to police officers are also pieces of circumstantial evidence the jury can use
to convict a defendant.  Furthermore, the State argues the evidence is
factually sufficient to prove Lewis-Grant committed murder because there was an
understanding between herself and Hopkins, and she had sufficient motive and
opportunity to commit the crime.

A

In evaluating the legal sufficiency of the evidence
to support a criminal conviction, we view all evidence in the light most
favorable to the verdict and determine whether a rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319 (1979); Hooper v. State, 214 S.W.3d
9, 13 (Tex. Crim. App. 2007); Childs v. State, 21 S.W.3d 631, 634 (Tex.
App.—Houston [14th Dist.] 2000, pet. ref’d).  We give deference to “‘the
responsibility of the trier of fact to fairly resolve conflicts in testimony,
to weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.’”  Hooper, 214 S.W.3d at 13 (quoting Jackson, 443
U.S. at 318–19).  The jury is the exclusive judge of the credibility of the
witnesses and of the weight to be given their testimony, and it is the
exclusive province of the jury to reconcile conflicts in the evidence.  Mosley
v. State, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998).  Hence, we do not
reevaluate the weight and credibility of all the evidence or substitute our
judgment for the fact finder’s.  King v. State, 29 S.W.3d 556,
562 (Tex. Crim. App. 2000).  Appellate courts merely ensure that the jury’s
decision was rational.  Muniz v. State, 851 S.W.2d 238, 246 (Tex. Crim.
App. 1993); Harris v. State, 164 S.W.3d 775, 784 (Tex. App.—Houston
[14th Dist.] 2005, pet. ref’d).  Additionally, we consider all of the evidence,
whether admissible or inadmissible.  Clayton v. State, 235 S.W.3d 772,
778 (Tex. Crim. App. 2007).

In evaluating the factual sufficiency of the
evidence, we consider all the evidence in a neutral light.  Prible v. State,
175 S.W.3d 724, 730–31 (Tex. Crim. App. 2005); Newby v. State, 252
S.W.3d 431, 435 (Tex. App.—Houston [14th Dist.] 2008, pet. ref’d).  Our
analysis must consider the evidence appellant claims is most important in
allegedly undermining the jury’s verdict.  Sims v. State, 99 S.W.3d 600,
603 (Tex. Crim. App. 2003); Newby, 252 S.W.3d at 435.  In a
factual-sufficiency review, an appellate court asks whether the evidence
supporting the verdict is so weak or so against the great weight and
preponderance of the evidence as to render the verdict manifestly unjust.  Steadman
v. State, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009).  We do not substitute
our judgment for the fact finder’s judgment.  Drichas v. State, 175
S.W.3d 795, 799 (Tex. Crim. App. 2005); Newby, 252 S.W.3d at 435.  “‘[A]n appellate court must first be able to say, with some
objective basis in the record, that the great weight and preponderance of the .
. . evidence contradicts the jury’s verdict before it is justified in
exercising its appellate fact jurisdiction to order a new trial.’”  Grotti
v. State, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008) (quoting Watson v.
State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006)).  Although we may
second-guess the jury to a limited degree, “the factual-sufficiency review
should still be deferential, with a high level of skepticism about the jury’s
verdict required before a reversal can occur.”  Id.  

The legal- and factual-sufficiency standards are the
same for both direct and circumstantial evidence.   See King, 29 S.W.3d
at 565.  Circumstantial evidence, by itself, may be enough to support the
jury’s verdict.  Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App.
1999).  Finally, the “cumulative force” of all the circumstantial evidence can
be sufficient for a jury to find the accused guilty beyond a reasonable doubt. 
See Powell v. State, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).




 

B

            “Since an
agreement between the parties to act together in a common design can seldom be
proved by words, the State must often rely on the actions of the parties, shown
by direct or circumstantial evidence to establish an understanding or a common
design to commit the offense.”  Miller v. State, 83 S.W.3d 308, 314
(Tex. App.—Austin 2002, pet. ref’d).  This agreement, if any, must be made
before or contemporaneously with the criminal event.  Beier v. State,
687 S.W.2d 2, 3–4 (Tex. Crim. App. 1985).  In deciding whether a person participated
in the offense, courts can review the events occurring before, during, and
after the commission of the offense.  Id. at 4.  Each fact need not
independently support the defendant’s guilt, as long as the cumulative effect
of all the incriminating evidence is sufficient to support the conviction.  Guevara
v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).  Additionally, motive
is a “significant circumstance indicating guilt.”  Id. at 50.  Inconsistent
statements and implausible explanations to police officers are also probative of
wrongful conduct and circumstances of guilt.  Id.    

1

            Both Lewis-Grant
and the State agree that Hopkins actually killed the complainant, and Hopkins
testified he pleaded guilty to the murder.  But Lewis-Grant suggests for the
evidence to be legally sufficient to convict her of murder, the State needed to
prove she intended for Hopkins to kill the complainant, she knew Hopkins planned
on killing the complainant that particular night, and she assisted him in
carrying out his plan.  She points this court to Vodochodsky v. State
for the proposition that for the evidence to be legally sufficient, a defendant
must do more than simply know about a plan to commit a crime to be convicted as
a party.  158 S.W.3d 502, 509–11 (Tex. Crim. App. 2005).  

In Vodochodsky, two men were accused of luring
police officers out to a home and then opening fire on them.  Id. at
505.  The State alleged the defendant knew his friend wanted to kill police
officers, assisted in killing and wounding multiple officers, and was guilty as
a party to the offense.  Id. at 504–08.  The defendant argued he was
simply present at the scene of the crime and he could not be held responsible
for his friend’s actions.  Id. at 509.  The court concluded the evidence
was legally sufficient because a rational jury could find: (1) the defendant
was present during the offense; (2) the defendant participated in the offense;
(3) the defendant made several inconsistent statements; (4) the defendant knew
his friend planned on killing police officers; and (5) the defendant desired to
help his friend “wrap up his affairs” before he committed suicide.  Id.
at 509–10.  

Vodochodsky is distinguishable from the case
at bar.  In Vodochodsky, the defendant’s accomplice killed himself after
the shoot-out with police officers.  Id. at 507.  All of the evidence
linking the defendant to the crime was circumstantial.  Here, not only is there
circumstantial evidence to support the jury’s verdict, but Hopkins testified he
and Lewis-Grant had an understanding that he would kill the complainant.  Hopkins
stated Lewis-Grant constantly told him how much she hated the complainant, and
she promised him various material items and the complainant’s social-security
benefits in exchange for killing him.  Ranger Ramos testified Jamie corroborated
Hopkins’ statements and confession, which implicated Lewis-Grant in the death
of the complainant.  In reviewing the events occurring before, during, and
after the commission of the offense, as stated in the facts above, there is
evidence Lewis-Grant encouraged, assisted, aided, or attempted to aid Hopkins
in killing the complainant.  Furthermore, Lewis-Grant had a motive to kill the
complainant, and she vocalized her hatred for the complainant and desire for
him to die to numerous people.  Lewis-Grant also made many inconsistent
statements about where she and Hopkins were the night before the complainant
died.  Lewis-Grant tried to shift the police’s and other witnesses’ attention
from her onto Jamie; a stranger, who was setting fire to her home and leaving
dead animals in her yard; and even the complainant himself, who she claimed
probably killed himself by using a bad dose of drugs.      

Although not all the testimony is consistent, we give
deference to “‘the responsibility of the trier of fact to fairly resolve
conflicts in testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.’”  Hooper, 214 S.W.3d at
13 (quoting Jackson, 443 U.S. at 318–19).  Taking together the testimony
and evidence presented at trial, all amount to ample circumstantial and direct evidence
that is legally sufficient to support the jury’s verdict.  Accordingly, we
overrule Lewis-Grant’s challenge to the legal sufficiency of the evidence
supporting her murder conviction.      

2

Concerning
her factual-sufficiency argument, Lewis-Grant contends “the only evidence that
[she] has the intent to promote or assist the commission of the offense came
from Hopkins.”  Lewis-Grant emphasizes Hopkins never told her he was going to
kill the complainant that night.  She also claims there was not a clear
understanding between herself and Hopkins; at best “there was an expectation
that [Hopkins] would kill [the complainant].”  Lewis-Grant argues “the
overwhelming weight of the evidence mitigates against the conclusion that [she]
solicited, encouraged, directed or attempted to aid Hopkins in committing the
offense.”  She contends Hopkins’ decision to kill the complainant was
unilateral and is not sufficient to support her own murder conviction.  

Although
Lewis-Grant denies she and Hopkins had an understanding he would kill the
complainant, a consideration of the evidence discussed above in a neutral light
reveals the jury had enough direct and circumstantial evidence to rationally
reach its conclusion.  In conjunction with the evidence detailed in the
sections above, the jury heard evidence demonstrating: (1) Lewis-Grant had
motive to kill the complainant; (2) she had tried to either kill him before or
hire Knutson to kill the complainant; (3) Lewis-Grant threatened the
complainant that she knew someone with teardrop tattoos who could “get rid” of
a person; (4) Lewis-Grant solicited, encouraged, assisted, aided, or attempted
to aid Hopkins in killing the complainant; (5) she recounted multiple stories
of the night before the complainant’s death to different people; (6) Jamie
corroborated Hopkins’ statements and confession; (7) Lewis-Grant stated whoever
killed the complainant did her a favor, and she constantly thanked Hopkins for
killing the complainant; and (8) she assisted in burning Hopkins’ and Jamie’s
clothes after the offense was committed.  

After
reviewing all the evidence, and comparing the evidence supporting the verdict
to the evidence contrary to it, we conclude that the proof of guilt is not so
obviously weak or against the great weight and preponderance of the evidence as
to render the verdict clearly wrong or manifestly unjust.  We, therefore, hold
the evidence is factually sufficient to support the jury’s verdict, and we
overrule Lewis-Grant’s challenge to the factual sufficiency of the evidence
supporting her murder conviction.

*
* *

For
the foregoing reasons, we affirm the trial court’s judgment.

 

    









                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices Yates,
Seymore, and Brown.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1]
This section addresses both of Lewis-Grant’s issues relating to her tampering
with or fabricating physical evidence conviction, cause number 14-09-00068-CR,
as well as issues three and five relating to her murder conviction, cause
number 14-09-00069-CR.





[2]
It is well-established that murder is a lesser-included offense of capital
murder.  See McKinney v. State, 207 S.W.3d 366, 370 (Tex. Crim. App.
2006).  





[3]
The law of parties does not need to be pleaded in an indictment.  Vodochodsky
v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005).